BARLOW ET AL. *v.* COLLINS, EXECUTIVE DIREC-
TOR, ALABAMA AGRICULTURAL STABILIZA-
TION AND CONSERVATION SERVICE, ET AL.

No. 249.   Argued November 19, 1969—Decided March 3, 1970

*Harold Edgar* argued the cause for petitioners *pro hac vice.* With him on the briefs were *Lee A. Albert* and *Jonathan Weiss.*

*Peter L. Strauss* argued the cause for respondents. With him on the brief were *Solicitor General Griswold, Assistant Attorney General Ruckelshaus, Alan S. Rosenthal,* and *Norman G. Knopf.*

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

The question to be decided in this case is whether tenant farmers eligible for payments under the upland cotton program enacted as part of the Food and Agriculture Act of 1965, 79 Stat. 1194, 7 U. S. C. § 1444 (d) (1964 ed., Supp. IV), have standing to challenge the validity of a certain amended regulation promulgated by the respondent Secretary of Agriculture in 1966.

The upland cotton program incorporates a 1938 statute, § 8 (g) of the Soil Conservation and Domestic Allotment Act, as amended, 52 Stat. 35 and 205, 16 U. S. C. § 590h (g), thereby permitting participants in the program to assign payments only "as security for cash or advances to finance making a crop." [1] The regulation

---

[1] The Secretary of Agriculture is authorized by 7 U. S. C. § 1444 (d)(5) (1964 ed., Supp. IV) to pay a farmer in advance of the growing season up to 50% of the estimated benefits due him. Section 1444 (d)(13) (1964 ed., Supp. IV) authorizes the farmer to assign such benefits subject to the limitations of § 8 (g) added by the 1938 Act, 16 U. S. C. § 590h (g). Section 8 (g) as enacted in 1938 and as it read in 1965 established an exception to the general prohibition against assignment of federal monies in the Anti-Assignment Act, 31 U. S. C. § 203. Section 8 (g) provided:

"A payment which may be made to a farmer under this section, may be assigned, without discount, by him in writing as security

of the respondent Secretary of Agriculture in effect until 1966 defined "making a crop" to exclude assignments to secure "the payment of the whole or any part of a cash . . . rent for a farm." 20 Fed. Reg. 6512 (1955).[2] Following passage of the 1965 Act, however, and before any payments were made under it, the Secretary deleted the exclusion and amended the regulation expressly to define "making a crop" to include assignments to secure

for cash or advances *to finance making a crop*. Such assignment shall be signed by the farmer and witnessed by a member of the county or other local committee . . . . Such assignment shall include the statement that the assignment is not made to pay or secure any preexisting indebtedness. This provision shall not authorize any suit against or impose any liability upon the Secretary . . . if payment to the farmer is made without regard to the existence of any such assignment." 52 Stat. 35 and 205, 16 U. S. C. § 590h (g) (emphasis added).

Section 8 (g) was amended by 80 Stat. 1167 (1966) to permit assignments not only to finance "making a crop" but also to fund "handling or marketing an agricultural commodity, or performing a conservation practice." 16 U. S. C. § 590h (g) (1964 ed., Supp. IV).

[2] 20 Fed. Reg. 6512 (1955) provided:

"*Payment may be assigned to finance making a crop.* A payment which may be made to a farmer . . . under section 8 of the Soil Conservation and Domestic Allotment Act, as amended, may be assigned only as security for cash or advances to finance making a crop for the current crop year. To finance making a crop means (a) to finance the planting, cultivating, or harvesting of a crop, including the purchase of equipment required therefor; (b) to provide food, clothing, and other necessities required by the assignor or persons dependent upon the assignor; or (c) to finance the carrying out of soil or water conservation practices. Nothing contained herein shall be construed to authorize an assignment given to secure the payment of the whole or any part of the purchase price of a farm or the payment of the whole or any part of a cash or fixed commodity rent for a farm."

"the payment of cash rent for land used [for planting, cultivating, or harvesting]." 31 Fed. Reg. 2815 (1966).[3]

Petitioners, cash-rent tenant farmers suing on behalf of themselves and other farmers similarly situated, filed this action in the District Court for the Middle District of Alabama. They sought a declaratory judgment that the amended regulation is invalid and unauthorized by statute, and an injunction prohibiting the respondent federal officials from permitting assignments pursuant to the amended regulation.[4] Their complaint

[3] 32 Fed. Reg. 14921 (1967), 7 CFR § 709.3 (1969) now provides: *"Purposes for which a payment may be assigned.*

"(a) A payment which may be made to a producer under any program to which this part is applicable may be assigned only as security for cash or advances to finance making a crop, handling or marketing an agricultural commodity, or performing a conservation practice, for the current crop year. No assignment may be made to secure or pay any preexisting indebtedness of any nature whatsoever.

"(b) To finance making a crop means (1) to finance the planting, cultivating, or harvesting of a crop, including the purchase of equipment required therefor and the payment of cash rent for land used therefor, or (2) to provide food, clothing, and other necessities required by the producer or persons dependent upon him.

"(c) Nothing contained herein shall be construed to authorize an assignment given to secure the payment of the whole or any part of the purchase price of a farm or the payment of the whole or any part of a fixed commodity rent for a farm."

[4] The respondents, in addition to the Secretary of Agriculture, are the State Executive Director of the Agricultural Stabilization and Conservation Service in Alabama, and the administrator of that Service in the U. S. Department of Agriculture. The complaint also included counts against petitioners' landlord alleging that he acted improperly to deprive them of their right to receive subsidy payments, and, further, that some of the petitioners had been illegally evicted because of their participation in litigation with respect to the cotton program, and, in the case of one petitioner, because of his candidacy for Alabama Agricultural Stabilization and Conservation Service county committeeman. The District Court denied the landlord's motion to dismiss these counts and transferred them for trial to the Southern District of Alabama. That ruling is not before us.

alleged that the petitioners are suffering irreparable injury under the amended regulation, because it provides their landlord "with the opportunity to demand that [they] and all those similarly situated assign the [upland cotton program] benefits in advance as a condition to obtaining a lease to work the land." [5] As a result, the complaint stated, the tenants are required to obtain financing of all their other farm needs—groceries, clothing, tools, and the like—from the landlord as well, since prior to harvesting the crop they lack cash and any source of credit other than the landlord. He, in turn, the complaint alleges, levies such high prices and rates of interest on these supplies that the tenants' crop profits are consumed each year in debt payments. Petitioners contend that they can attain à "modest measure of economic independence" if they are able to use their "advance subsidy payments . . . [to] form cooperatives to buy [supplies] at wholesale and reasonable prices in lieu of the excessive prices demanded by [the landlord] of . . . captive consumers with no funds to purchase elsewhere." Thus, petitioners allege that they suffer injury in fact from the operation of the amended regulation.

The District Court, in an unreported opinion, held that the petitioners "lack standing to maintain this action against these [respondent] governmental officials," because the latter "have not taken any action which directly invades any legally protected interest of the plaintiffs." The Court of Appeals for the Fifth Circuit affirmed, one judge dissenting. 398 F. 2d 398. It held that petitioners lacked standing not only because they alleged

---

[5] The complaint stated that some of the petitioners "were denied the right to work the land" when they refused to execute assignments to their landlord. The complaint also alleged that "[p]laintiffs have been tenant farmers on this land from eleven to sixty-one years . . . and [two of them] have been on this land all their lives."

no invasion of a legally protected interest but also because petitioners "have not shown us, nor have we found, any provision of the Food and Agriculture Act of 1965 which either expressly or impliedly gives [petitioners] standing to challenge this administrative regulation or gives the Courts authority to review such administrative action." *Id.*, at 402. We granted certiorari. 395 U. S. 958.

Our decision in *Data Processing Service* v. *Camp, ante,* p. 150, leads us to reverse here.

First, there is no doubt that in the context of this litigation the tenant farmers, petitioners here, have the personal stake and interest that impart the concrete adverseness required by Article III.

Second, the tenant farmers are clearly within the zone of interests protected by the Act.

Implicit in the statutory provisions and their legislative history is a congressional intent that the Secretary protect the interests of tenant farmers. Both of the relevant statutes expressly enjoin the Secretary to do so. The Food and Agriculture Act of 1965 states that "[t]he Secretary shall provide adequate safeguards to protect the interests of tenants . . . ." 79 Stat. 1196, 7 U. S. C. § 1444 (d)(10) (1964 ed., Supp. IV).[6] Title 7 U. S. C. § 1444 (d)(13) (1964 ed., Supp. IV), as noted earlier, incorporates by reference § 8 (g), as amended, 52 Stat. 35 and 205, 16 U. S. C. § 590h (g). Section 8 (b) of that Act, in turn, provides that "the Secretary shall, as far as practicable, protect the interests of tenants . . . ." 52 Stat. 32, 16 U. S. C. § 590h (b). The legislative history of the "making a crop" provision, though sparse, similarly indicates a congressional intent

---

[6] In connection with the amended regulations, the Secretary issued under § 1444 (d)(10) various rules designed to ensure that tenants receive their fair share of the federal payments. 31 Fed. Reg. 4887–4888; 7 CFR §§ 722.817, 794.3.

to benefit the tenants.[7] They are persons "aggrieved by agency action within the meaning of a relevant statute" as those words are used in 5 U. S. C. § 702 (1964 ed., Supp. IV).

Third, judicial review of the Secretary's action is not precluded. The Court of Appeals rested its holding on the view that no provision of the Food and Agriculture Act of 1965 "expressly or impliedly . . . gives the Courts authority to review such administrative action." 398 F. 2d, at 402. Whether agency action is reviewable often poses difficult questions of congressional intent; and the Court must decide if Congress has in express or implied terms precluded judicial review or committed the challenged action entirely to administrative discretion.

The Administrative Procedure Act, 5 U. S. C. § 701 (a) (1964 ed., Supp. IV), allows judicial review of agency action except where "(1) statutes preclude judicial review; or (2) agency action is committed to agency discretion by law." The amended regulation here under challenge was promulgated under 16 U. S. C. § 590d (3) which authorizes the Secretary to "prescribe such regulations, as he may deem proper to carry out the provisions of this chapter." Plainly this provision does not expressly preclude judicial review, nor does any other provision in either the 1938 or 1965 Act. Nor does the authority to promulgate such regulations "as he may

---

[7] See the remarks of Representative Fulmer, 82 Cong. Rec. 844 (1937), and of Senator Adams, id., at 1756. The fact that assignments could be made at all indicated a congressional concern for the farmers' welfare, in light of the general statutory prohibition on assignment of federal claims embodied in the Anti-Assignment Act, 31 U. S. C. § 203. This concern was noted in a letter from the Secretary of Agriculture to the President of the Senate in January 1952, in which the Secretary stated that § 8 (g) "was enacted for the purpose of creating additional credit to farmers to assist them in financing farming operations." S. Rep. No. 1305, 82d Cong., 2d Sess., 3.

deem proper" in § 590d (3) constitute a commitment of the task of defining "making a crop" entirely to the discretionary judgment of the Executive Branch without the intervention of the courts. On the contrary, since the only or principal dispute relates to the meaning of the statutory term, the controversy must ultimately be resolved, not on the basis of matters within the special competence of the Secretary, but by judicial application of canons of statutory construction. See *Texas Gas Transmission Corp.* v. *Shell Oil Co.,* 363 U. S. 263, 268–270. "The role of the courts should, in particular, be viewed hospitably where . . . the question sought to be reviewed does not significantly engage the agency's expertise. '[W]here the only or principal dispute relates to the meaning of the statutory term' . . . [the controversy] presents issues on which courts, and not [administrators], are relatively more expert." *Hardin* v. *Kentucky Utilities Co.,* 390 U. S. 1, 14 (HARLAN, J., dissenting). Therefore the permissive term "as he may deem proper," by itself, is not to be read as a congressional command which precludes a judicial determination of the correct application of the governing canons.

The question then becomes whether nonreviewability can fairly be inferred. As we said in *Data Processing Service,* preclusion of judicial review of administrative action adjudicating private rights is not lightly to be inferred. See *Leedom* v. *Kyne,* 358 U. S. 184; *Harmon* v. *Brucker,* 355 U. S. 579; *Stark* v. *Wickard,* 321 U. S. 288; *American School of Magnetic Healing* v. *McAnnulty,* 187 U. S. 94. Indeed, judicial review of such administrative action is the rule, and nonreviewability an exception which must be demonstrated. In *Abbott Laboratories* v. *Gardner,* 387 U. S. 136, 140, we held that "judicial review of a final agency action by an aggrieved person will not be cut off unless there is persuasive reason to believe that such was the purpose of

Congress." A clear command of the statute will preclude review; and such a command of the statute may be inferred from its purpose. *Switchmen's Union* v. *National Mediation Board,* 320 U. S. 297. It is, however, "only upon a showing of 'clear and convincing evidence' of a contrary legislative intent" that the courts should restrict access to judicial review. *Abbott Laboratories* v. *Gardner, supra,* at 141. The right of judicial review is ordinarily inferred where congressional intent to protect the interests of the class of which the plaintiff is a member can be found; in such cases, unless members of the protected class may have judicial review the statutory objectives might not be realized. See the *Chicago Junction Case,* 264 U. S. 258; *Hardin* v. *Kentucky Utilities, supra.*

We hold that the statutory scheme at issue here is to be read as evincing a congressional intent that petitioners may have judicial review of the Secretary's action.

The judgments of the Court of Appeals and of the District Court are vacated and the case is remanded to the District Court for a hearing on the merits.

*It is so ordered.*

MR. JUSTICE BRENNAN, with whom MR. JUSTICE WHITE joins, concurring in the result and dissenting.*

I concur in the result in both cases but dissent from the Court's treatment of the question of standing to challenge agency action.

The Court's approach to standing, set out in *Data Processing,* has two steps: (1) since "the framework of Article III . . . restricts judicial power to 'cases' and 'controversies,'" the first step is to determine "whether

---

*[This opinion applies also to No. 85, *Association of Data Processing Service Organizations, Inc., et al.* v. *Camp, Comptroller of the Currency, et al., ante,* p. 150.]

the plaintiff alleges that the challenged action has caused him injury in fact"; (2) if injury in fact is alleged, the relevant statute or constitutional provision is then examined to determine "whether the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question."

My view is that the inquiry in the Court's first step is the only one that need be made to determine standing. I had thought we discarded the notion of any additional requirement when we discussed standing solely in terms of its constitutional content in *Flast* v. *Cohen,* 392 U. S. 83 (1968). By requiring a second, nonconstitutional step, the Court comes very close to perpetuating the discredited requirement that conditioned standing on a showing by the plaintiff that the challenged governmental action invaded one of his legally protected interests.[1]  *Barlow* is a typical illustration of the harm that resulted from that requirement. The only substantial issue in that case goes to the merits: does the statutory language "making a crop" create a legally protected interest for tenant farmers in the form of a prohibition against the assignment of their federal benefits to secure cash rent?  By confusing the merits with the plaintiffs' standing to challenge the Secretary's action, both the District Court and the Court of Appeals denied the farmers the focused and careful decision on the merits to which they are clearly entitled.  Although

---

[1] Cf. the language in *Associated Industries* v. *Ickes,* 134 F. 2d 694, 700 (C. A. 2d Cir. 1943): "In a suit in a federal court by a citizen against a government officer, complaining of alleged past . . . unlawful conduct by the defendant, there is no justiciable 'controversy'. . . unless the citizen shows that such conduct . . . invades . . . a private substantive legally protected interest of the plaintiff citizen; such invaded interest must be either of a 'recognized' character, at 'common law' or a substantive private legally protected interest created by statute [or Constitution]."

this Court properly reverses the Court of Appeals on that account, it encourages more *Barlow* decisions by engrafting its wholly unnecessary and inappropriate second step upon the constitutional requirement for standing.

Before the plaintiff is allowed to argue the merits, it is true that a canvass of relevant statutory materials must be made in cases challenging agency action. But the canvass is made, not to determine *standing,* but to determine an aspect of *reviewability,* that is, whether Congress meant to deny or to allow judicial review of the agency action at the instance of the plaintiff.[2] The Court in the present cases examines the statutory materials for just this purpose but only after making the same examination during the second step of its standing inquiry. Thus in *Data Processing* the Court determines that the petitioners have standing because they alleged injury in fact and because "§ 4 [of the Bank Service Corporation Act of 1962] arguably brings a competitor within the zone of interests protected by it." The Court then determines that the Comptroller's action is reviewable at the instance of the plaintiffs because "[b]oth [the Bank Service Corporation Act and the National Bank Act] are clearly 'relevant' statutes within the meaning of [the Administrative Procedure Act, 5 U. S. C. § 702 (1964 ed., Supp. IV)]. The Acts do not in terms protect a specified group. But their general policy is apparent; and those whose interests are directly affected by a broad or narrow interpretation of the Acts are easily

---

[2] Reviewability has often been treated as if it involved a single issue: whether agency action is conclusive and beyond judicial challenge by anyone. In reality, however, reviewability is equally concerned with a second issue: whether the *particular* plaintiff then requesting review may have it. See the Administrative Procedure Act, 5 U. S. C. §§ 701 (a) and 702 (1964 ed., Supp. IV). Both questions directly concern the extent to which persons harmed by agency action may challenge its legality.

identifiable. It is clear that petitioners, as competitors of national banks that are engaging in data processing services, are within that class of 'aggrieved' persons who, under § 702, are entitled to judicial review of 'agency action.' " Again in *Barlow*, the plaintiff tenant farmers are found to have standing because they alleged injury in fact and because "tenant farmers are . . . within the zone of interests protected by the Act." Examination of the same statutory materials subsequently leads the Court to the conclusion that the tenant farmers are entitled to judicial review of the Secretary's action because "the statutory scheme . . . is to be read as evincing a congressional intent that petitioners may have judicial review of the Secretary's action."

I submit that in making such examination of statutory materials an element in the determination of standing, the Court not only performs a useless and unnecessary exercise but also encourages badly reasoned decisions, which may well deny justice in this complex field. When agency action is challenged, standing, reviewability, and the merits pose discrete, and often complicated, issues which can best be resolved by recognizing and treating them as such.

## I

### STANDING

Although *Flast* v. *Cohen* was not a case challenging agency action, its determination of the basis for standing should resolve that question for all cases. We there confirmed what we said in *Baker* v. *Carr*, 369 U. S. 186, 204 (1962), that the "gist of the question of standing" is whether the party seeking relief has "alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult . . . ques-

tions." "In other words," we said in *Flast*, "when standing is placed in issue in a case, the question is whether the person whose standing is challenged is a proper party to request an adjudication of a particular issue" and not whether the controversy is otherwise justiciable,[3] or whether, on the merits, the plaintiff has a legally protected interest that the defendant's action invaded. 392 U. S., at 99–100. The objectives of the Article III standing requirement are simple: the avoidance of any use of a "federal court as a forum [for the airing of] generalized grievances about the conduct of government," and the creation of a judicial context in which "the questions will be framed with the necessary specificity, . . . the issues . . . contested with the necessary adverseness and . . . the litigation . . . pursued with the necessary vigor to assure that the . . . challenge will be made in a form traditionally thought to be capable of judicial resolution." *Id.,* at 106. Thus, as we held in *Flast,*

---

[3] Other elements of justiciability are, for instance, ripeness, *e. g., Poe* v. *Ullman,* 367 U. S. 497 (1961), mootness, *e. g., United States* v. *W. T. Grant Co.,* 345 U. S. 629 (1953), and the policy against friendly or collusive suits, *e. g., Chicago & Grand Trunk R. Co.* v. *Wellman,* 143 U. S. 339 (1892); *United States* v. *Johnson,* 319 U. S. 302 (1943). "Justiciability" is also the term of art used to refer to the constitutional necessity that courts not deal with certain issues lest they "intrude into areas committed to the other branches of government." *Flast, supra,* at 95. The political-question doctrine has its analogue in the sphere of administrative law in the concept of nonreviewability. See, *e. g., Chicago & Southern Air Lines, Inc.* v. *Waterman Steamship Corp.,* 333 U. S. 103 (1948); *Schilling* v. *Rogers,* 363 U. S. 666 (1960). And, of course, federal courts may not decide questions over which they lack jurisdiction, *e. g., Brown Shoe Co.* v. *United States,* 370 U. S. 294, 305 (1962); *American Fire & Casualty Co.* v. *Finn,* 341 U. S. 6, 17–18 (1951). Thus, on many grounds other than an absence of standing, a court may dismiss a lawsuit without proceeding to the merits to determine whether the plaintiff presents a claim upon which relief may be granted, and, if so, whether he has borne his burden of proof.

"the question of standing is related only to whether the dispute sought to be adjudicated will be presented in an adversary context and in a form historically viewed as capable of judicial resolution." *Id.*, at 101.[4] See also *Chicago* v. *Atchison, T. & S. F. R. Co.*, 357 U. S. 77, 83–84 (1958).

In light of *Flast*, standing exists when the plaintiff alleges, as the plaintiffs in each of these cases alleged, that the challenged action has caused him injury in fact, economic or otherwise.[5] He thus shows that he has the requisite "personal stake in the outcome" of his suit. *Baker* v. *Carr, supra*, at 204. We may reasonably expect that a person so harmed will, as best he can, frame the relevant questions with specificity, contest the issues with the necessary adverseness, and pursue the litigation vig-

---

[4] It is true, of course, that in certain types of litigation parties may properly request judicial resolution of issues not "presented in an adversary context." See Davis, Standing: Taxpayers and Others, 35 U. Chi. L. Rev. 601, 607 (1968). But in most instances, among them private challenges to agency action, the plaintiff must establish his adverseness to obtain standing.

[5] Thus, for purposes of standing, it is sufficient that a plaintiff allege *damnum absque injuria*, that is, he has only to allege that he has suffered harm as a result of the defendant's action. Injury in fact has generally been economic in nature, but it need not be. See, *e. g., Scenic Hudson Preservation Conf.* v. *FPC*, 354 F. 2d 608 (C. A. 2d Cir. 1965); *Office of Communication of United Church of Christ* v. *FCC*, 123 U. S. App. D. C. 328, 359 F. 2d 994 (1966). The more "distinctive or discriminating" the harm alleged and the more clearly it is linked to the defendant's action, the more easily a plaintiff may meet the constitutional test. See L. Jaffe, Judicial Control of Administrative Action 501 (1965). The plaintiffs in the present cases alleged distinctive and discriminating harm, obviously linked to the agency action. Thus, I do not consider what must be alleged to satisfy the standing requirement by parties who have sustained no special harm themselves but sue rather as taxpayers or citizens to vindicate the interests of the general public.

orously.[6] Recognition of his standing to litigate is then consistent with the Constitution, and no further inquiry is pertinent to its existence.

## II

### REVIEWABILITY

When the legality of administrative action is at issue, standing alone will not entitle the plaintiff to a decision on the merits. Pertinent statutory language, legislative history, and public policy considerations must be examined to determine whether Congress precluded all judicial review, and, if not, whether Congress nevertheless foreclosed review to the class to which the plaintiff belongs. Under the Administrative Procedure Act (APA), "statutes [may] preclude judicial review" or "agency action [may be] committed to agency discretion by law." 5 U. S. C. § 701 (a) (1964 ed., Supp. IV). In either case, the plaintiff is out of court, not because he had no standing to enter, but because Congress has stripped

---

[6] Past decisions of this Court indicate that a person who has suffered injury in fact meets the relevant Article III requirement. See, for example, *FCC* v. *Sanders Bros. Radio Station,* 309 U. S. 470, 476–477 (1940); *Scripps-Howard Radio, Inc.* v. *FCC,* 316 U. S. 4 (1942). In these decisions the Court permitted parties economically harmed by administrative action to challenge it although no legal interest of the parties was found to have been invaded by the action. The Court stated in *Scripps-Howard Radio, supra,* at 14, that "[t]he Communications Act of 1934 did not create new private rights. The purpose of the Act was to protect the public interest in communications. By § 402 (b)(2) Congress gave the right of appeal to persons 'aggrieved or whose interests are adversely affected' by Commission action." Accordingly, since Congress cannot expand the Article III jurisdiction of federal courts, *Muskrat* v. *United States,* 219 U. S. 346 (1911), it follows that injury in fact renders a party adverse under the Constitution. Cf. K. Davis, 3 Administrative Law Treatise § 22.02, at 211 (1958); Jaffe, *supra,* n. 5, at 336.

the judiciary of authority to review agency action. Review may be totally foreclosed, as in *Schilling* v. *Rogers,* 363 U. S. 666 (1960), or, if permitted, it may nonetheless be denied to the plaintiff's class. But the governing principle laid down in *Abbott Laboratories* v. *Gardner,* 387 U. S. 136, 140 (1967), is that "judicial review of a final agency action by an aggrieved person will not be cut off unless there is persuasive reason to believe that such was the purpose of Congress."

The APA provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U. S. C. § 702 (1964 ed., Supp. IV). Congressional intent that a particular plaintiff have review may be found either in express statutory language granting it to the plaintiff's class,[7] or, in the absence of such express language, in statutory indicia from which a right to review may be inferred.[8] Where, as in the instant cases, there is no express grant of review, reviewability has ordinarily been inferred from evidence that Congress intended the plaintiff's class to be a beneficiary of the statute under which the plaintiff raises his claim. See, for example, the *Chicago Junction Case,* 264 U. S. 258 (1924); *Hardin* v. *Kentucky Utilities Co.,* 390 U. S. 1

---

[7] See, *e. g.,* the Securities Act of 1933, which provides that "[a]ny person aggrieved by an order of the Commission may obtain a review," 15 U. S. C. § 77i (a), and the Federal Power Act, which grants review to "[a]ny party to a proceeding under this chapter aggrieved by an order issued by the Commission in such proceeding . . . ." 16 U. S. C. § 825*l* (b).

[8] Section 702 also provides that "[a] person suffering legal wrong because of agency action . . . is entitled to judicial review thereof." Though a person suffering such wrong is clearly entitled to review, he need not show the existence of a legally protected interest to establish either his standing or his right to review. The existence of that interest is a question of the merits.

(1968); *Norwalk CORE* v. *Norwalk Redevelopment Agency,* 395 F. 2d 920 (C. A. 2d Cir. 1968). In light of *Abbott Laboratories,* slight indicia that the plaintiff's class is a beneficiary will suffice to support the inference.[9]

## III

### THE MERITS

If it is determined that a plaintiff who alleged injury in fact is entitled to judicial review, inquiry proceeds to the merits—to whether the specific legal interest claimed by the plaintiff is protected by the statute and to whether the protested agency action invaded that interest.[10] It is true, of course, that matters relevant to the merits will already have been touched tangentially in the determination of standing and, in some cases, in the determination of reviewability. The aspect of the merits touched in establishing standing is the identification of injury in fact, the existence of which the plaintiff must prove. The merits are also touched in establishing reviewability in cases where the plaintiff's right to review must be inferred from evidence that his class is a statutory beneficiary. The same statutory indicia that afford the plaintiff a right to review also bear on the merits, because they provide evidence that the statute protects his class, and thus that he is entitled to relief if he can show that the challenged agency action violated the statute. Evidence that the plaintiff's class is a statutory beneficiary, however, need not be as strong for the purpose of obtaining review as

---

[9] This is particularly the case when the plaintiff is the only party likely to challenge the action. Refusal to allow him review would, in effect, commit the action wholly to agency discretion, thus risking frustration of the statutory objectives.

[10] If the alleged legal interest is clearly frivolous, or proof to substantiate the alleged injury in fact is wholly lacking, the plaintiff can be hastened from court by summary judgment.

for the purpose of establishing the plaintiff's claim on the merits. Under *Abbott Laboratories*, slight beneficiary indicia will suffice to establish his right to have review and thus to reach the merits.

## IV

To reiterate, in my view alleged injury in fact, reviewability, and the merits pose questions that are largely distinct from one another, each governed by its own considerations. To fail to isolate and treat each inquiry independently of the other two, so far as possible, is to risk obscuring what is at issue in a given case, and thus to risk uninformed, poorly reasoned decisions that may result in injustice. Too often these various questions have been merged into one confused inquiry, lumped under the general rubric of "standing." The books are full of opinions that dismiss a plaintiff for lack of "standing" when dismissal, if proper at all, actually rested either upon the plaintiff's failure to prove on the merits the existence of the legally protected interest that he claimed,[11] or on his failure to prove that the challenged agency action was reviewable at his instance.[12]

The risk of ambiguity and injustice can be minimized by cleanly severing, so far as possible, the inquiries into reviewability and the merits from the determination of standing. Today's decisions, however, will only compound present confusion and breed even more litigation over standing. In the first place, the Court's formula-

---

[11] *E. g., Tennessee Power Co. v. TVA*, 306 U. S. 118 (1939); *Association of Data Processing Service Organizations, Inc. v. Camp*, 406 F. 2d 837, 843 (C. A. 8th Cir. 1969); *Barlow v. Collins*, 398 F. 2d 398, 401 (C. A. 5th Cir. 1968).

[12] *E. g., Association of Data Processing Service Organizations, Inc. v. Camp, supra*, at 843; *Barlow v. Collins, supra*, at 401–402; *Harrison-Halsted Community Group, Inc. v. Housing & Home Finance Agency*, 310 F. 2d 99 (C. A. 7th Cir. 1962).

tion of its nonconstitutional element of standing is obscure. What precisely must a plaintiff do to establish that "the interest sought to be protected . . . is arguably within the zone of interests to be protected or regulated by the statute"? How specific an "interest" must he advance? Will a broad, general claim, such as competitive interest, suffice, or must he identify a specific legally protected interest? When, too, is his interest "arguably" within the appropriate "zone"? Does a mere allegation that it falls there suffice? If more than an allegation is required, is the plaintiff required to argue the merits? And what is the distinction between a "protected" and a "regulated" interest? Is it possible that a plaintiff may challenge agency action under a statute that unquestionably regulates the interest at stake, but that expressly excludes the plaintiff's class from among the statutory beneficiaries?

In the second place, though the Court insists that its nonconstitutional standing inquiry does not involve a determination of the merits, I have grave misgivings on this score. The formulation of the inquiry most certainly bears a disquieting similarity to the erroneous notion that a plaintiff has no standing unless he can establish the existence of a legally protected interest. Finally, assuming that the inquiry does not, in fact, focus on the merits, then surely it serves only to determine whether the challenged agency action is reviewable at the instance of the plaintiff in cases where there is no express statutory grant of review to members of his class.[13] And, if this is so, it has no place in the determination of standing. In terms of treating related questions with one another, this inquiry is best made

---

[13] In cases involving statutes that do expressly grant the plaintiff a right to review, there would be no need for the Court's second standing inquiry—unless it serves to provide a preview of the merits.

in the reviewability context. The Constitution requires for standing only that the plaintiff allege that actual harm resulted to him from the agency action. Investigation to determine whether the constitutional requirement has been met has nothing in common with the inquiry into statutory language, legislative history, and public policy that must be made to ascertain whether Congress has precluded or limited judicial review.[14] More fundamentally, an approach that treats separately the distinct issues of standing, reviewability, and the merits, and decides each on the basis of its own criteria, assures that these often complex questions will be squarely faced, thus contributing to better reasoned decisions and to greater confidence that justice has in fact been done. The Court's approach does too little to guard against the possibility that judges will use standing to slam the courthouse door against plaintiffs who are entitled to full consideration of their claims on the merits. The Court's approach must trouble all concerned with the function of the judicial process in today's world. As my Brother DOUGLAS has said: "The judiciary is an indispensable part of the operation of our federal system. With the growing complexities of government it is often the one and only place where effective relief can be obtained. . . . [W]here wrongs to individuals are done . . . it is abdication for courts to close their doors." *Flast* v. *Cohen, supra,* at 111 (concurring opinion).

---

[14] I would apply my view that all examination of statutory language and congressional intent, as they bear on the right of the plaintiff to challenge agency action, should be made only in the reviewability context even if the pertinent statutory material speaks of "standing" or "statutory aid to standing." Statutory materials, of course, would be properly consulted in the determination of standing if they purport to define what constitutes injury in fact.