Doris M. TUCKER et al., Plaintiffs,
Appellants,

v.

Clifford M. HARDIN, Secretary, U. S.
Department of Agriculture, Defendant,
Appellee.

No. 7556.

United States Court of Appeals,
First Circuit.

Aug. 14, 1970.

David F. Cavers, Jr., Boston, Mass.,
with whom Acheson H. Callaghan, Jr.,
and Palmer & Dodge, Boston, Mass.,
were on the brief, for appellants.

James C. Hair, Jr., Atty., Dept. of Justice, with whom William D. Ruckelshaus,
Asst. Atty. Gen., Herbert F. Travers,
Jr., U. S. Atty., and Alan S. Rosenthal,
Atty., Dept of Justice were on the brief,
for appellee.

Before ALDRICH, Chief Judge, McENTEE and COFFIN, Circuit Judges.

738

COFFIN, *Circuit Judge.*

This appeal presents the question whether the Secretary of Agriculture may—consistent with Congressional intent or the concepts of equal protection embodied in the Due Process Clause of the Fifth Amendment—require communities to pay local distribution costs as a prerequisite to the receipt of surplus agricultural commodities under the Commodity Distribution Program, when the effect of the Secretary's rule is to make such commodities available only to a limited number of communities in Massachusetts. We hold that, in the circumstances here presented, he can.

Plaintiffs are a Massachusetts welfare rights organization [1] and seventeen indigent women admittedly eligible for surplus commodities under the Program but residents of communities not presently receiving such commodities because no funds have been provided for local distribution costs. Prior to 1968, the cost of welfare was borne by local communities in Massachusetts and 22 communities had appropriated the funds necessary to participate in the Program. When the state took over all welfare functions and costs in 1968, it continued the necessary payments for the 22 communities but has failed to provide additional funds to enable other Massachusetts communities—allegedly 329 in number—to participate. Plaintiffs sought declaratory and injunctive relief against the Secretary on the grounds that his "local payment" rule was contrary to the legislative intent behind the Program and a denial of equal protection to those Massachusetts indigents not residing in the 22 communities. The district court dismissed their complaint, holding that plaintiffs had no standing to raise their statutory claim and that they had failed to state an equal protection claim.

■■ In light of two Supreme Court decisions handed down since the district court's decision,[2] plaintiffs have standing to raise their statutory objections because their interests are "within the zone of interests protected" by the Commodity Distribution Program.[3] We conclude, however, that their objections cannot prevail.[4]

The relevant portions of the Commodity Distribution Program have their origin in two separate Congressional Acts. The first provision, enacted as section 32 of the Agricultural Adjustment Act of 1935, creates a fund to be used (1) to encourage exportation of agricultural commodities, (2) to encourage domestic consumption of agricultural commodities, in part "by increasing their utilization * * * among persons in low income groups", and (3) to reestablish farmers' purchasing power. 7 U.S.C. § 612c (1964). The statute also provides that such fund shall be expended in such manner and amounts as the Secretary of

1. Mothers Who Care, Inc.

2. Association of Data Processing Service Organizations, Inc. v. Camp, 397 U.S. 150, 153, 155–156, 90 S.Ct. 827, 25 L.Ed. 2d 184 (1970); Barlow v. Collins, 397 U.S. 159, 164–165, 90 S.Ct. 832, 25 L. Ed.2d 192 (1970).

3. See 7 U.S.C. §§ 612c(2), 1431(3) (1970 Supp.); Peoples v. United States Department of Agriculture, 427 F.2d 561 (D.C.Cir. February 3, 1970).

   There is no question that plaintiffs have been injured in fact by the Secretary's rule and thus have the personal stake and interest which imparts concrete adverseness and satisfies the other prerequisite of standing. Indeed, in light of these two recent decisions, the Secre-

tary had candidly conceded that plaintiffs have standing here.

4. It is disheartening that some eligible indigents do not receive surplus commodities under this Program because their communities are too poor—or unwilling—to comply with the Secretary's rule. See Harrington, The Other America, Mac-Millan Company (1963). We share the sense of frustration evident in the opinion of the federal district court for the Northern District of Texas. Jay v. United States Department of Agriculture, 308 F. Supp. 100 (N.D.Tex.1969). Our question is not what Congress or the Secretary should do but whether Congress has authorized, and the Constitution permits, what the Secretary is doing.

Agriculture finds will effectuate "any one or more" of the aforementioned purposes.

The second provision, enacted as part of the Agriculture Act of 1949, authorizes the Commodity Credit Corporation, under regulations deemed by the Secretary of Agriculture to be in the public interest, to dispose of surplus agricultural commodities (1) as payment for commodities not produced in the United States, (2) as barter for strategic materials, or (3) as a donation, inter alia, "in the assistance of needy persons". 7 U.S.C. § 1431 (1970 Supp.). The Secretary, acting through the Commodity Credit Corporation, is also authorized to pay handling and other charges up to the time of delivery to the distributing agency.

On the basis of the broad delegation of authority contained in these two statutory provisions, the Secretary promulgated various regulations creating the Commodity Distribution Program. 7 C.F.R. §§ 250, 251. The Secretary determined, in light of the express provisions of 7 U.S.C. § 1431, that local distribution costs normally, are to be borne by the distributing agency. 7 C.F.R. § 250.4(e). In a limited number of very poor communities where the local authorities had refused to request or distribute the commodities, the Secretary has shouldered the distribution costs. See 7 C.F.R. §§ 250.15; 251. However, the Secretary has determined that only a limited amount of the fund established by section 32 of the 1935 Act is available for payment of such costs. 7 C.F.R. § 251.1.

Plaintiffs contend that Congress has not authorized the Secretary to limit surplus commodities under the Program to those communities which are willing to bear the local distribution cost. However, section 1431 expressly authorizes the Secretary to pay processing and handling costs *up to the point of delivery* to the distributing agency, clearly suggesting that the distributing agency will have to bear the remaining expenses.[5] While section 612c does authorize the Secretary to spend from the fund so as to effectuate the purposes for the fund set forth in the statute—thereby justifying the Secretary's limited payment of local distribution costs in very poor areas—it also makes him the judge of the "manner" and "amounts" to be spent on "one or more" of the specified purposes. These considerations alone suggest to us that the Secretary's "local payment" rule is within the authority granted to him by the statutes in question.

Furthermore, plaintiffs' argument misconceives both the purposes for and the limited resources of the section 612c fund from which the Secretary pays distribution costs. That fund, as the title and text of section 612c makes clear, was created as one means of improving the general economic status of American farmers. 7 U.S.C. § 612c.[6] It is administered by the Secretary of Agriculture, not the Secretary of Health, Education and Welfare. Specifically, the money is to be used to increase foreign and domestic consumption of agricultural commodities so as to prevent surpluses from developing and depressing farm market conditions; one of several ways this is accomplished is by increasing consumption by the poor. Section 1431 complements section 612c by actually taking surplus commodities off the market,

---

5. Such a "local payment" rule, expressed in more explicit language, has been a common feature of recent Congressional welfare legislation. E. g., Food Stamp Program, 7 U.S.C. § 2024 (1970 Supp.) ; National School Lunch Program, 42 U.S. C. § 1756 (1969).

6. The statute appropriates an annual amount for the fund equal to 30% of the gross customs receipts. This figure was chosen because "the farm population of the United States is roughly 30 percent of the total population, [and therefore] this provision will make available for the benefit of the farmer a sum equivalent to his fair share of the tariff receipts." H. Rep. No. 1241, 74th Cong., 1st Sess., p. 6 (1935).

As further evidence of the Congressional intent for this fund, *see* n. 7 *infra.*

again partly by giving them to persons who would not be likely to purchase them. The very fact that the availability of funds and commodities under the Commodity Distribution Program is dependent on the varying demands of farm market protection indicates the secondary nature of the assistance to indigents provided by the Program. *See* Peoples v. United States Department of Agriculture, 427 F.2d 561 (D.C. Cir. February 3, 1970).

We read these statutes as encouraging assistance to the needy as a means and a desirable by-product of farm market protection. If the Secretary had no authority to limit expenditures on distribution costs, it is possible that the fund might be entirely consumed on only one of the statutory usages for the fund: encouraging consumption by persons in low income groups. At that point the Secretary would have either to abandon that usage of the funds as too costly, or to abandon the other uses set forth in the statute. We cannot believe that Congress intended to force the Secretary to that choice, particularly when the group primarily to be helped is farmers —whose interests may be best served by utilizing the fund for *all* the statutory uses—and when the Secretary is explicitly authorized to use the fund for "one or more" of the aforementioned usages. Plaintiffs have not satisfied us either that the holding they seek would not tend to overburden the fund or that Congress intended to prevent the Secretary from anticipating and avoiding such burdens.

Plaintiffs' argument, however, proceeds on the assumption that the fund is virtually limitless and likely to remain so. It is apparently true that some $300 million was carried forward to fiscal 1969 and some $200 million returned to the Treasury. *See also* Jay v. United States Department of Agriculture, 308 F.Supp. 100, 104–105 (N.D.Tex.1969). However, the proposed use of these section 612c funds, including, specifically, the amounts intended to be used in paying local administrative and distribution costs, is reported to Congress in the proposed budget of the Department of Agriculture for each fiscal year. Under these circumstances, the contention that the Secretary is free to spend all of the funds which he receives simply does not take into account either the budgetary process or the realities governing relationships between the executive branch and the Congress. That Congress has been vigilant in guarding these funds for their farm market protection purpose is apparent from various Congressional committee reports.[7] These reports indicate that the annual surplus is to be maintained as insurance against future emergencies in the agricultural commodities market. In the face of this grudging consent given for some thirty years to the Secretary's exercise of discretion in using a minor portion of section 612c funds for the payment of some distribution costs, we cannot construe his refusal to undertake such payments nationally as an abuse of discretion or a frustration of Congressional intent.

7. For example, in disapproving the Secretary's use of the fund to pay administrative costs in connection with the Food Stamp Program, the Senate Committee on Agriculture stated:

"Section 32 funds are appropriated for the purpose of removing surplus stocks of agricultural commodities, primarily perishable agricultural commodities, from the market whenever that action may become necessary. Ordinarily the amount appropriated exceeds the amount used, but it is appropriated so that it will be available when needed. Transfer of these funds to other purposes tends to remove this insurance." S.Rep. No. 289, 90th Cong., 1st Sess., pp. 1–2 (1967).

*See also* S.Rep. No. 1331, 88th Cong., 2d Sess., p. 28 (1964); H.Rep. No. 1387, 88th Cong., 2d Sess., p. 34 (1964); S. Rep. No. 1908, 87th Cong., 2d Sess., pp. 16–17 (1963); S.Rep. 287, 78th Cong., 2d Sess., pp. 9–10 (1944).

In 1948, the Secretary was permitted to carry over up to $300 million annually in order to "formulate long-range surplus disposal programs". Conf.Rep. No. 2448, 80th Cong., 2d Sess., (1948).

Plaintiffs' second contention is that the Secretary's "local payment" rule denies equal protection to indigents in those Massachusetts communities not receiving surplus commodities under the Program. Our framework of analysis was recently reiterated in Dandridge v. Williams, 397 U.S. 471, 485, 90 S.Ct. 1153, 1161, 25 L.Ed.2d 491 (1970), where the Court stated:

> "If the classification has some 'reasonable basis,' it does not offend the Constitution simply because the classification 'is not made with mathematical nicety or because in practice it results in some inequality.'"

Since the classification in this case is between those communities which shoulder local distribution costs and those communities which do not, our question is whether the Secretary's "local payment" rule has a "reasonable basis".

We conclude that it does. First, as we have discussed above, the Secretary's rule is designed to conserve the money available in the section 612c fund so that the primary purpose for the fund —protection of the farm market—can be effectuated through use of the means set forth in the statute. The effectuation of that primary purpose could be frustrated by a requirement that the Secretary bear the full cost of distributing the surplus commodities in those states where some but not all of the communities are already participating. In addition, the rule, by encouraging state participation in the welfare function, forestalls the manifold expansion of the food distribution bureaucracy within the Department of Agriculture which would be involved in a national assumption of local costs to guarantee that the needs of all are met. Indeed, while such "local payment" prerequisites appear in other federal welfare statutes (*see* n. 5), we are aware of no decisions holding such requirement violative of equal protection.

Since the Secretary's classification has a "reasonable basis", it is consistent with equal protection unless its effect is to create an invidious discrimination. Yick Wo v. Hopkins, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886); cf. Dandridge v. Williams, *supra* 397 U.S. at 485 n. 17, 90 S.Ct. 1153. Here the effect of the Secretary's rule in Massachusetts is to some extent arbitrary in that the 22 communities which do receive surplus commodities under the Program are needy but apparently no more needy than those communities which do not. However, this effect is the result of Massachusetts' recent conversion from local to state funding of welfare programs. The state simply continued funding whatever welfare programs its communities were engaged in at the time of conversion. There is no suggestion whatever that any cognizable group of citizens is substantially underrepresented in those 22 communities receiving commodities under the Program. When confronted with this situation, the Secretary had either to adhere to his "local payment" rule or to abandon it and assume all distribution costs in Massachusetts. We cannot say that he denied equal protection in these circumstances by adhering to his reasonable based rule, thereby meeting only part of the welfare needs in Massachusetts. *See* Developments in the Law—Equal Protection, 82 Harv.L.Rev. 1069, 1084–1086 (1969).

Affirmed.