SUNTEX DAIRY et al.,
Plaintiffs-Appellants,

v.

Robert BERGLAND, Secretary of
Agriculture of the United States,
Defendant-Appellee.

No. 77–1632.

United States Court of Appeals,
Fifth Circuit.

March 22, 1979.

Gary Gurwitz, Charles C. Murray, McAllen, Tex., for plaintiffs-appellants.

James R. Gough, U. S. Atty., Mary L. Sinderson, James S. Dougherty, Asst. U. S. Attys., Houston, Tex., John H. Sandor, Atty., U. S. Dept. of Agriculture, Washington, D. C., for defendant-appellee.

Before JONES, CLARK and GEE, Circuit Judges.

CHARLES CLARK, Circuit Judge:

This appeal concerns whether producers of milk have standing under the Agricultural Marketing Agreement Act of 1937, 7 U.S.C. § 601 *et seq.*, to seek judicial review of the imposition of a federal milk marketing order. The appellants are independent milk producers operating in the Rio Grande Valley and the area surrounding Corpus Christi, Texas. They allege that the Secretary of Agriculture's promulgation of a Texas-wide milk marketing order was invalid because not supported by substantial evidence, and because a large dairy cooperative, Associated Milk Producers, Inc. ("AMPI"), allegedly violated a Missouri district court antitrust injunction by bloc voting its members during the referendum conducted to ratify the order.[1] The district court held that the milk producers did not have standing to bring a substantive attack on the milk marketing order, but that the producers did have standing to challenge the referendum procedures. The court ruled on the merits of that issue that the actions of AMPI were not violative of the Missouri district court injunction.

Holding that Milk producers do have standing to launch a substantive attack on a federal milk marketing order, we reverse the district court and remand for a determination of the merits of the producer's substantive claims. Although we believe that AMPI's conduct may well be held to have

violated the Missouri district court injunction, we hold that the producers may not attack the federal milk marketing on that ground.

## I.

Prior to 1975, the sale of milk in the area encompassing the Rio Grande Valley and Corpus Christi, Texas was regulated under the Corpus Christi Federal Milk Marketing Order. The Corpus Christi Order was one of six separate federal milk marketing orders regulating different geographic regions within Texas. On May 2, 1975, the Secretary of Agriculture promulgated an order eliminating the six separate milk marketing orders in Texas and instituting a new Texas Marketing Area Milk Market Order, an order comprising all the area previously regulated by the six separate orders and some additional areas.

The effect of the new Texas-wide order was to lower the minimum price paid to milk producers in the former Corpus Christi Marketing Order area. Although a federal milk marketing order does not literally set the price for milk sales, it does set the minimum price which must be paid producers for their milk. Milk producers—dairy farmers—receive a "blend price" from the "handlers" who purchase and distribute their milk. The blend price is the uniform price paid to producers for all milk they sell to handlers no matter how it is eventually used. The blend price is arrived at by averaging under a weighted formula the prices of Class I milk—primarily fluid milk—and the prices of Class II milk—milk used for the production of cheese and other dairy products. Fluid milk brings higher prices than milk sold for cheese or other by-products, but it must be sold soon after its production to avoid spoilage.

The blend price mechanism established by a milk marketing order acts as a stabilizing influence that insulates farmers from the

---

1. AMPI has been under an injunction from the United States District Court for the Western District of Missouri barring bloc voting in any referendum "if the effect of such vote will be to terminate any existing Federal Marketing Order." The appellants claim that the referendum conducted on the Texas-wide order did have the effect of terminating the Corpus Christi and other separate Texas orders, and that AMPI's bloc voting in the referendum thus violated the outstanding injunction.

buffeting of prices that would otherwise accompany differences in consumer demand. Handlers basically sell all that the market will absorb as Class I milk, with the surplus going to Class II usages. Any handler who receives more income from the sale of his purchased milk supply (after certain subtractions and additions) than he paid his producers under the blend price deposits the difference in a producer-settlement fund. This excess would reflect a strong consumer demand for fluid milk and thus relatively higher overall milk sale income. Any handler who receives less income than he paid producers under the blend price may subtract the difference from the producer settlement fund. By incorporating the former Corpus Christi order into a larger Texas-wide order, the Secretary of Agriculture forced the Corpus Christi area producers to share in a much larger marketing pool than they had under the prior order. Because the Corpus Christi area Class I utilization was higher than the Texas-wide average Class I utilization, the effect was redistributive; the Corpus Christi area producers received a lower minimum price for their milk, while producers in other areas of Texas saw their income rise.

The process leading to the promulgation of a federal milk marketing order is set forth in section 8c of the Agricultural Marketing Agreement Act, 7 U.S.C. § 608c. The Secretary of Agriculture initiates the process of establishing a marketing order by proposing an order whenever he has "reason to believe" that an order is warranted. 7 U.S.C. § 608c(3). Following the proposal, there must be notice of an opportunity for a hearing. 7 U.S.C. § 608c(3). After conducting a hearing, the Secretary is to issue the order if "upon the evidence introduced at such hearing" the Secretary finds that issuance of the order "will tend to effectuate the declared policy" of the Act. 7 U.S.C. § 608c(4). After promulgation of the order under section 608c(4), an order still may not become effective until two-thirds of the producers in the market area or producers accounting for two-thirds of the total volume of milk produced in the

area ratify the order by referendum. 7 U.S.C. § 608c(8). Section 608c(9) provides that handlers also have some ratification rights; no marketing agreement adopting the terms of an order can become effective if handlers accounting for 50 percent of the volume in an area fail to sign it. The 50 percent handler approval requirement can be overcome, however, if the Secretary finds that the order tends to effectuate the Act's policy and "the issuance of [an] order is the only practical means of advancing the interests of the producers." 7 U.S.C. § 608c(9)(B). Finally, section 608c(15) gives handlers the right to petition the Secretary any time any obligation imposed by the market order is deemed to be "not in accordance with law" and modification or exemption from the order is sought. 7 U.S.C. § 608c(15). Upon such petition the handler is entitled to a hearing, and the section specifically provides for judicial review of the Secretary's determination. Although handlers are the only group that the statute specifically mentions as having a right to seek judicial review, the statute nowhere explicitly excludes producers from seeking such review.

The district court ruled that milk producers did not have standing to seek judicial review on the substantive merits of the Secretary's determination that a new Texas-wide order should be promulgated. The court ruled that only handlers, and not producers, have standing under the statutory scheme to bring substantive challenges to market orders. It reasoned that since the statute specifically grants handlers the right of judicial review, the implication is that producers are excluded from seeking such review. The court further supported its position by arguing that in lieu of judicial review producers are protected by the provisions of the Act which grant them an opportunity for a hearing at the initial stages of the process, and by the requirement of two-thirds producer ratification before an order may become effective.

## II.

The milk producers have standing to contest the substantive legality of orders

promulgated pursuant to the Agricultural Marketing Agreement Act of 1937 if they can meet the three-part test established in *Barlow v. Collins*, 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970) and *Association of Data Processing Serv. Organ., Inc. v. Camp*, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970). That test is: (1) the challenged action must result in injury-in-fact to the plaintiffs; (2) the interest invaded must be arguably within the zone of interest to be protected by the statute; and (3) there must be no statutory prohibition of judicial review.

■ All parties concede that the new Texas-wide marketing order results in injury-in-fact to the producers in the former Corpus Christi marketing order area by reducing the "blend price" they receive for milk. The crucial issues thus are whether the producer's interests are arguably within the zone of interest to be protected by the statute and whether the statute prohibits judicial review. Resolution of those two issues is controlled by *Stark v. Wickard*, 321 U.S. 288, 64 S.Ct. 559, 88 L.Ed. 733 (1944) and *Consolidated-Tomoka Land Company v. Butz*, 498 F.2d 1208 (5th Cir. 1974).

*Stark* was a suit brought by milk producers challenging certain deductions that were being made from the adjustment fund. The producers involved, like the plaintiffs here, were "not members of a cooperative association [and] as producers, many of them voted against the challenged amendment on the producer's referendum." 321 U.S. at 301, 64 S.Ct. at 567. The Supreme Court held that the producers had a legal right to receive payments in accordance with the Act and could judicially challenge the marketing order on the grounds that the order did not comply with the Act. *Id.* at 303–11, 64 S.Ct. at 568–571. As part

of its discussion the Court noted that the only opportunity that the producers had to challenge the marketing order "was to appear at hearings and to vote for or against the proposed order." *Id.* at 307, 64 S.Ct. at 569. "So long as the provisions are within the statutory authority of the Secretary," the court stated, "such hearings and ballotings furnish adequate opportunity for protest. . . . But where as here the issue is statutory power to make the deduction required by Order . . . , a mere hearing or opportunity to vote cannot protect minority producers against unlawful exactions which might be voted upon them by majorities." *Id.*, 64 S.Ct. at 569–70. (citations omitted) The court stated that "[t]here is no direct judicial review granted by this statute," *id.* at 307–08, 64 S.Ct. at 570, but it noted that "it is not to be lightly assumed that the silence of the statute bars from the courts an otherwise justiciable issue." *Id.* at 309, 64 S.Ct. at 570. The Court took notice of the fact that section 608c(15) specifically grants handlers a right to judicial review, but rather than infer any exclusionary intent as to producers from that provision, the Court treated it as evidence of congressional intent "to submit many questions arising under its administration to judicial review," *id.* at 308, 64 S.Ct. at 570, and it stated that it had previously "construed the Act to grant handlers judicial relief in addition to the statutory review specifically provided by § 8c(15)." *Id.* The Court held that the producers did have standing to bring their suit.[2]

In *Tomoka*, producers sought review of a ratification referendum on the grounds that there were illegalities attendant to the election process. The court first rejected the assertion that producers had no interests arguably within the zone protected by the Act:

---

2. The arguments made by the Secretary against judicial review are the same arguments made in Justice Frankfurter's dissent in *Stark*. 321 U.S. at 311, 64 S.Ct. at 571 (Frankfurter, J., dissenting). The assertions that Congress intended to give producers the protections of a hearing and referendum in lieu of judicial review, and that an intent to exclude review for producers should be inferred from the express

authorization for review given handlers, both originated in that dissenting opinion. *See* 321 U.S. at 315–20, 64 S.Ct. at 573–76. The fact that Justice Frankfurter's interpretation of the Act was forcefully presented to the Supreme Court and squarely rejected seriously undermines the Secretary's invocation of it here, even if *Stark* is technically distinguishable.

As we view the Agricultural Marketing Act, Congress intended not to foreclose judicial review at the instance of producers such as the plaintiffs, but, on the contrary, intended, through the device of a validly conducted referendum, to give decisive weight to their views. The Act, 7 U.S.C. § 608(8), provides that no marketing order shall be effective unless the Secretary determines that the issuance of the order is approved either by two-thirds of the producers of the commodity proposed to be regulated by the order in the production area specified in the order, or by producers who have produced for market "at least two-thirds of the volume of such commodity produced for market within the production area." In light of this deference the statute itself pays to the interests of producers, it is clear that those interests are "arguably within the zone of interests to be protected or regulated by the statute . . . in question", and hence meet the test for standing to secure judicial review set forth in *Association of Data Processing Service Organizations, Inc. v. Camp.*

498 F.2d at 1209–10.

The *Tomoka* court then went on to reject the theory that the express grant of a right of judicial review for handlers evidenced an intent by Congress to exclude judicial review at the behest of producers, stating that: "Preclusion of judicial review must be founded on a ground more firm than *expressio unius exclusio alterius.*" *Id.* at 1210.

Although both *Stark* and *Tomoka* may be distinguished on their facts, their reasoning runs plainly and squarely against the Secretary. It is true that unlike the "arbitrary and capricious" claim made by the produc-

ers here, *Stark* involved a narrower claim to specific monies in the adjustment fund, and *Tomoka* concerned a procedural rather than substantive attack. But both *Stark* and *Tomoka* found that Congress did not intend to deny recourse to the courts by producers merely because it took the precaution of specifically authorizing judicial review for handlers. Having firmly established that principle, the force of *Stark* and *Tomoka* may not be avoided simply by distinguishing the nature of the complaint which producers have against a particular marketing order. In *Stark* the Supreme Court noted that the right to vote in a ratification referendum "cannot protect minority producers against unlawful exactions which might be voted upon them by majorities." 321 U.S. at 307, 64 S.Ct. at 569–70. No less than in *Stark*, the outnumbered independent milk producers here are alleging unlawful exactions by the majority; the precise nature of the alleged illegality does not alter the fact of practical economic loss, and cannot affect the producers' standing to bring their claim. Under *Stark* and *Tomoka*, the interests of producers are well within the zone protected by the Act, and Congress has not barred them from defending their interests in the federal courts.[3] The milk producers have standing to seek substantive review of the Secretary's finding that a Texas-wide order should be effectuated, and we remand to the district court for the purposes of conducting that substantive review.

### III.

When the producer referendum on the Texas-wide order was conducted, the dairy cooperative AMPI voted its constituent members as a bloc in favor of the new

---

3. The Secretary also cites the Ninth Circuit's holding in *Rasmussen v. Hardin*, 461 F.2d 595 (9th Cir.), *cert. denied*, 409 U.S. 933, 93 S.Ct. 229, 34 L.Ed.2d 188 (1972), to support his position that only handlers are entitled to judicial review under the statute. *Rasmussen* denied standing to a group of consumers seeking to challenge a federal milk marketing order. We find the generalized interests of consumers in a marketing order totally different from the interests of producers. The statute goes to great lengths to guard the interests of producers by providing for administrative hearings and a ratification referendum. No such Congressional deference was shown consumers. Producers also have a definite and direct economic stake in a milk market order, distinguishing them from consumers, who, as the *Rasmussen* court stated, "are affected by the order only if they choose to buy 'Go,' and then only if they must pay a higher price for it." 461 F.2d at 599. The holding in *Rasmussen* simply does not support the Secretary's position in this case.

order. AMPI had previously been a defendant in a large multidistrict antitrust suit that was consolidated for trial in the United States District Court for the Western District of Missouri. Allegedly predatory practices by AMPI in the South Texas area were among the issues presented in the Missouri litigation. The suit ended with a complex consent decree against AMPI. Paragraph VIII of the decree reads:

> The defendant is hereby enjoined and restrained for a period of five (5) years from the entry of this Final Judgment, from exercising its right to vote on behalf of its members pursuant to the terms of 7 U.S.C. §§ 608c(9)(1), 608c(12) and 608c(16)(b), if the effect of such vote will be to terminate any existing Federal Milk Marketing Order.

The appellants argue that the referendum in this case resulted in the termination of the Corpus Christi and other Texas marketing orders, and their replacement with a new order. Since the effect of the vote was termination of existing orders, the appellants reason that AMPI's bloc voting was illegal, and that the order should thus be set aside. The defendant-appellee's argument, accepted by the district court, is that the injunction refers only to situations where an area is totally deregulated, and not to situations where one marketing order is replaced by a larger one.

 Although AMPI's bloc voting may well be held to have resulted in the termination of existing federal marketing orders and thus have violated the terms of the Missouri district court injunction, we hold that the federal marketing order itself may not be invalidated on that ground. Bloc voting by cooperatives such as AMPI is expressly authorized by the statute. 7 U.S.C. § 608c(12). The Missouri district court injunction cannot affect that statutory provision, it merely operates to enjoin certain conduct by AMPI. An injunction

decree operates in personam, and an act done in violation of an injunction is not a nullity. *See Davis v. Prudential Insurance Company of America*, 331 F.2d 346, 350 (5th Cir. 1964);[4] 42 Am.Jur.2d Injunctions § 338.

 If AMPI's bloc voting is found by the Missouri court to be in violation of its injunction, it may be in contempt of that court. The appropriate response to such contempt, if it exists, is a matter for the Missouri district court under that court's continuing jurisdiction to enforce or protect its injunction order.

 Regardless of whether such litigation is pursued or of its outcome, a federal milk marketing order cannot be invalidated because some entity involved in the promulgation process acted in contempt of court. The redress for any violation of an antitrust injunction must be tailored to effectuate the purposes of the antitrust laws which the injunction served to enforce. It would not be proper to attempt to effectuate the purposes of an antitrust injunction by voiding, in a separate action, a part of the federal regulation of milk marketing merely because it happens to have involved the proscribed activity of the contemptor. A court reviewing a federal milk marketing order has no such power.

The judgment of the district court is reversed and remanded for proceedings not inconsistent with this opinion.

**REVERSED and REMANDED.**

---

4. *Davis* involved a husband's change of beneficiary on an insurance policy away from his ex-wife, in violation of a restraining order issued in a divorce proceeding. The court held that whatever remedies for violation of the injunction might exist in the nature of contempt proceedings or damage actions, violation of the injunction did not "void the transfer . . . in a suit by the protected party against the transferee." 331 F.2d at 350.