CITY OF NEWARK, NEW JERSEY, et al., Plaintiffs,

v.

W. Michael BLUMENTHAL, Secretary of the Treasury, et al., Defendants.

Civ. A. No. 74–548.

United States District Court, District of Columbia.

Jan. 17, 1978.

James Robertson, Washington, D. C., for plaintiffs.

Lawrence J. Jensen, Dept. of Justice, Washington, D. C., for defendants.

## MEMORANDUM

GESELL, District Judge.

By this civil action the Cities of Newark and Baltimore seek judicial review of a discretionary decision made by the Secretary of the Treasury affecting their respective entitlements under provisions of the State and Local Fiscal Assistance Act of 1972, 31 U.S.C. § 1221, *et seq.* (Supp. V 1975) [hereinafter referred to as Revenue Sharing Act], and a direction that their past and future allocations under that Act be increased. Plaintiffs completed discovery into the facts and circumstances underlying the challenged decision of the Secretary. Defendants then renewed an earlier motion to dismiss or, in the alternative, for summary judgment. Plaintiffs cross-moved for summary judgment, and after receiving briefs and hearing oral argument the issues are now ripe for decision. No material fact is in dispute.

The Revenue Sharing Act establishes seven entitlement periods and appropriates money to a trust fund from which the Secretary of the Treasury is directed to allocate funds to state and local governments pursuant to specified formulae and other statutory limitations. Population is, of course, one factor the Secretary must consider. The Act specifies that "[p]opulation shall be determined on the same basis as resident population is determined by the Bureau of the Census for general statistical purposes." 31 U.S.C. § 1228(a)(1) (Supp. V 1975). Subsection (a)(7), dealing with uniformity of data, further provides:

(A) *General rule.* Except as provided in subparagraph (B), the data used shall be the most recently available data provided by the Bureau of the Census or the Department of Commerce, as the case may be.

(B) *Use of estimates, etc.* Where the Secretary determines that the data referred to in subparagraph (A) are not current enough or are not comprehensive enough to provide for equitable allocations, he may use such additional data (including data based on estimates) as may be provided for in regulations.

The origin of the present controversy is found in a paper presented April 1973 by Jacob S. Siegel, a Senior Statistician of the Census Bureau, which analyzed the 1970 Census and indicated that the Census Bureau had underestimated national population by 5.3 million persons. Siegel broke this undercount down further, estimating an undercount rate of 7.7% for black residents nationally and a 1.9% undercount rate for white residents nationally. Since the Secretary quite properly had been relying on the 1970 Census for allocations to the some 38,000 participating states, counties,

and municipalities, it was not surprising that Newark and Baltimore, with black populations of 52% and 47% respectively, sensed a possible basis for claiming a larger population and thus obtaining larger allocations under the Revenue Sharing formula. Newark sought administrative relief and when unsuccessful filed this suit. Before an answer was filed, and over defendants' objections, the complaint was amended to add Baltimore as a party plaintiff.

Plaintiffs here contend that the Secretary, who was aware of this national undercount through his delegees, abused his discretion and acted capriciously in not adopting a mathematical formula for adjusting revenue allotments by translating this national undercount estimate to estimates at the local level. They seek an order (1) directing the Secretary to prepare such estimates as will take into account the undernumeration of blacks and more correctly reflect the population of Newark and Baltimore for each entitlement period, and (2) requiring the Secretary then to recalculate the additional revenue sharing monies to which each city is entitled on the basis of such estimates and to pay them accordingly for each entitlement period.

Defendants strongly contest the Court's jurisdiction to review decisions by the Secretary allocating tax revenues to the political entities participating in the Revenue Sharing program. The Revenue Sharing Act provides for judicial review by the Courts of Appeals of any decision by the Secretary to reduce or withhold payments to a state or unit of local government. *Id.* § 1263(c). It contains no affirmative grant of jurisdiction to review the general scheme of allocation or any recipient's proportionate share of that allocation. Plaintiffs proceed on the theory, however, that under 28 U.S.C.A. § 1331(a) (West Supp. 1977) and section 10 of the Administrative Procedure Act [APA], 5 U.S.C. § 702 (1970), the Court has jurisdiction to review the Secretary's alleged abuse of discretion in not adjusting revenue allocation to reflect the estimated

black population undercount indicated in Siegel's paper.

The APA authorizes review of agency action on behalf of any "person suffering legal wrong because of [that] action." *Id.* By its own terms, however, review is not available (1) where another statute precludes judicial review, or (2) of any agency action wholly committed by law to agency discretion. *Id.* § 701(a). Review in this instance has not been expressly precluded, and the Court will not imply preclusion from the limited grant of review in the Revenue Sharing Act, especially given the absence of any legislative intent toward that end. *See Abbott Laboratories v. Gardner,* 387 U.S. 136, 141, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967); *Consumer Federation of America v. FTC,* 169 U.S.App.D.C. 136, 139, 515 F.2d 367, 370 (1975).

The Secretary's action does, however, appear to be one wholly committed to his discretion.[1] The Revenue Sharing Act provides, as already noted, that the Secretary *"may"* use additional data (including estimates) if data provided by Census is not "comprehensive enough to provide for equitable allocations." 31 U.S.C. § 1228(a)(7)(B) (Supp. V 1975) (emphasis added). There is no requirement that additional data in fact be used, nor is there any statutory standard that even suggests when such general terms as "comprehensive enough" or "equitable allocations" come into play. In arguing nonetheless that the Secretary does not have complete discretion as a matter of law, plaintiffs rely on *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), and *Scanwell Laboratories, Inc. v. Shaffer,* 137 U.S.App. D.C. 371, 424 F.2d 859 (1970). In plaintiffs' view the law is found in the statutory language "equitable allocations," a term carried over into the Secretary's own regulations without further definition. 31 C.F.R. § 51.28 (1976).

---

1. As will later appear this is not a case in which the Secretary refused to act, as plaintiffs suggest; he in fact affirmatively exercised discretion.

The term "equitable allocation" is imprecise, to say the least. Even could the Court immerse itself into the manifest intricacies and technicalities that operate in carrying out this enormously complex Revenue Sharing operation, there is no standard it could apply except to substitute its judgment for that of the Secretary, a result plainly unauthorized by the APA, 5 U.S.C. § 706(2) (1970). *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. at 416, 91 S.Ct. 814. The Revenue Sharing Act provides no guidelines. As already noted, the Siegel estimates indicate that of the 5.3 million persons not counted, 1.87 million were black residents and 3.43 million were Cacasian. To be sure, the 7.7% national undercount rate for blacks was greater than the 1.9% undercount rate for whites, but "equitable allocation" defies definition when the task of translating this nationwide estimated discrepancy to some 38,000 communities is confronted. Surely Congress was not attempting to mandate mathematical certainty. At the most, "equitable allocation" connotes a division that is reasonable, impartial, and fair. The Court is given no precise standard against which the allocation may be viewed.

Thus this case, unlike those cited above, presents one of "those rare instances where 'statutes are drawn in such broad terms that . . . there is no law to apply.'" *Id.* at 410, 91 S.Ct. at 821 (quoting S.Rep. No. 752, 79th Cong., 1st Sess. 26 (1945)). The Revenue Sharing Act simply allows the Secretary to use estimates as a tool in carrying out his duties if he so chooses. In no situation is the Secretary required to do so. It therefore cannot under any circumstances be arbitrary and capricious not to use estimates rather than simply to follow the figures of Census, which Congress set as the controlling standard. In this instance the Court cannot order the Secretary to make a discretionary determination, and his decision not to do so is therefore nonreviewable. *Wheelabrator Corporation v. Chafee,* 147 U.S.App.D.C. 238, 455 F.2d 1306 (1971).[2]

Judge Leventhal suggested in the *Wheelabrator* case that in circumstances like this a court might nonetheless be justified in permitting a "peek," to be satisfied that no extrinsic facts exist to demonstrate

2. Even if the Secretary's decision is not wholly committed to his discretion, it is reviewable only if plaintiffs have exhausted their administrative remedies. *E. g., McKart v. United States,* 395 U.S. 185, 89 S.Ct. 1657, 23 L.Ed.2d 194 (1969). The Secretary strenuously urges that plaintiffs have failed to pursue administrative remedies and cannot reopen all entitlement periods. The Revenue Sharing Act provides for seven entitlement periods spanning the period January 1, 1972, to December 31, 1976. Finality is obviously an important factor in the effective administration of the program, and the Secretary has attempted to assure finality by regulations that allow recipients to question data factors periodically, specifying that in the absence of challenge by date certain, the data used cannot thereafter be challenged. 31 C.F.R. § 51.29 (1976). Newark made no challenge to population data until the fourth entitlement period. Baltimore never filed an administrative challenge to population data at any time.

Since the deadline for challenging the first three entitlement allocations expired February 12, 1973, plaintiffs note that they could not have complained because the undercount was not publicized until April of that year. They also contend that the data improvement program was not designed to accommodate something as fundamental as the undercount and that in fact no administrative appeal was required.as a condition precedent to suit. Both of these arguments are rejected. The revenue sharing program requires finality, and the regulations cover this situation. Accordingly, Newark may challenge only entitlements four through seven. Baltimore is excused from taking an administrative appeal after Newark's objections to four were denied: because the issues were identical, appeal would have been futile. *See Lodge 1858, American Federation of Government Employees v. Paine,* 141 U.S. App.D.C. 152, 166, 436 F.2d 882, 896 (1970). Baltimore's present challenge to five through seven will be recognized.

Defendants have suggested that Newark lacks standing because under the formula used to compute its allocation an erroneous determination of population has no effect on the city's Revenue Sharing entitlement. Newark, however, disputes not only the undercount but also the validity of defendants' formula. Had the "correct" formula been used, it is argued, population would have been relevant and Newark would have suffered from the undercount. Thus standing exists for the purposes of the motions.

blatant departure from recognized administrative standards. This wise advice was apparently accepted by the judge to whom this case was originally assigned. He granted full discovery into the exercise of the Secretary's discretion even beyond a "peek." The resulting extensive record demonstrates with crystal clarity that the Secretary conscientiously exercised his discretion and that if that exercise is subject to review, his decision not to depart from regular Census data in an attempt to adjust for the undercount by estimate was unassailable under any standard.

The administration of the complex Revenue Sharing program involved allocations to many different state, county, and local governments. The Secretary through his delegee, Graham W. Watt, Director of Revenue Sharing, carefully considered the possibility of adjusting for the undercount when the Siegel paper was brought to his attention. A method of estimating the undercount at the state and local level was needed to translate the national figure, itself an estimate, to localities in aid of allocation. This was recognized as a highly technical and intricate undertaking: because factors such as population composition and trends and census procedures [3] varied widely among localities, no flat, across-the-board estimate would have been equitable or proper. Seeking a statistically valid comprehensive technique, Watt had a series of discussions with top technical experts at Census. Although as early as April 1973 Census had advised that it was not practical to make allocations of the undercount to local levels, Watt continued to pursue the matter. Stanford Research Institute was contracted to consider whether there were statistically valid data available in or out of Census. The Institute reported there was no such data. This report as well as Census material were reviewed by the Data and Demography Section of Watt's office. Still no solution was found. A workshop was held with interested groups seeking solution. Nothing satisfactory to the Secretary was developed. It was determined not to attempt an estimate for the some 38,000 entities involved. This was a rational decision based on an informed judgment.

■ Central to plaintiffs' position is their claim, based on the affidavit of their own expert, that a statistically reliable procedure was available in April 1973 for adjusting the 1970 Census population data at the state, county, and local level to reflect the undercount. The motion papers raise doubts as to the reliability of plaintiffs' expert's procedure, but this dispute is not at the core of the controversy. Rather, the question is whether or not the Secretary abused his discretion in determining not to adopt a particular mathematical formula to reflect the undercount, preferring instead, after soliciting and obtaining advice from his own experts and retained consultants, to rest his allocations on the regular Census data as directed by the Act. The Act does not require the Secretary to adopt a statistical method for estimating even if one exists, and he was satisfied after consultation with Census and outside experts that an equitable adjustment could not be achieved by estimates attempting to reduce a national estimate to the local level. Recognizing these considerations plaintiffs belabor their position by suggesting that the Secretary was too cautious in evaluating possible estimation procedures, requiring "near absolute demographic accuracy and purity." This, however, he had every right to do.

The Secretary's discretion under 31 U.S.C. § 1228(a)(7)(B) is not reviewable. Alternatively, if reviewable, his decision not to estimate the undercount for Baltimore and for Newark was neither arbitrary nor capricious.

Summary judgment is granted defendants and denied plaintiffs.[4]

SO ORDERED.

---

3. For example, in the actual census special effort had been made to prevent black undercount in some selected cities, including Newark and Baltimore.

4. In view of the result reached herein, it is unnecessary to discuss defendants' claim of sovereign immunity.