**CITY OF CAMDEN, a Municipal corporation of the State of New Jersey et al.**

v.

**Manuel PLOTKIN, etc., et al.**

**Civ. A. No. 77–1827.**

United States District Court, D. New Jersey.

Oct. 31, 1978.

---

Peter J. O'Connor, Cherry Hill, N. J., for plaintiffs.

Robert J. Del Tufo, U. S. Atty. by Mary Catherine Cuff, Asst. U. S. Atty., Trenton, N. J., for defendants.

BROTMAN, District Judge.

Presently before the court is defendants' motion to dismiss for lack of subject matter jurisdiction, Fed.R.Civ.P. 12(b)(1), and for failure to state a claim upon which relief can be granted, Fed.R.Civ.P. 12(b)(6). The motion was argued on May 19, 1978, at which time this court reserved judgment.

In this civil action, plaintiffs seek judicial review of the manner in which the defendants Bureau of the Census and its Director conducted the 1976 "Pretest Census" in Camden, New Jersey. Plaintiffs are the City of Camden, a municipal corporation of the State of New Jersey, and three individual plaintiffs who seek to bring the action on behalf of themselves and those similarly situated. Two of the individual plaintiffs, one black and one Puerto Rican Camden resident, are currently employed in federally-funded CETA[1] jobs. The third named plaintiff is a black Camden resident who has been certified eligible for the CETA program, but cannot be employed under the federal program due to limited funding allocations to Camden.

Plaintiffs allege that defendants' undercounting of national population in general and of minority groups in particular in and since the 1970 decennial census has caused Camden to be shortchanged in its allocation of federal funds. The individual plaintiffs in the first group allege that they are threatened with loss of their CETA-funded jobs and the individual plaintiff in the second group alleges that his present lack of such a job is due to the asserted undercounting.

The controversy stems from an experimental program or "pretest" census undertaken by defendants in response to a 1973 study by one of its statisticians. This study analyzed the 1970 census and concluded that it underestimated national population, particularly undercounting blacks. Camden was one of three cities which voluntarily participated in the pretest census, undertaken there in September 1976. The 1970 census set Camden's population at 102,550. In January 1977, Camden was advised that the pretest indicated a population of 87,305, later revised upward to 90,292.

Later that month, Camden was further advised that the annual population estimate for 1975 was 89,214 and that this figure would be forwarded to the Office of Revenue Sharing as the basis for the City's funding allocations. Plaintiffs challenge both figures as inaccurate, alleging that the 1975 estimate is based on data from the pretest census. (Plaintiffs' Brief in Opposition, p. 1, n. 2; Amended Complaint ¶¶ 9 through 11). Plaintiffs allege that the pretest figures are "replete with error" facially (Amended Complaint ¶ 4), and that both the pretest and estimate figures are extrapolations from the admittedly incorrect 1970 census figures (Amended Complaint ¶ 22). In addition, plaintiffs list seventy-seven "administrative problems" with the conduct of the pretest census. (Exhibit I to Plaintiffs' Brief in Opposition).

The City was informed at the time it received the pretest results that it would have ten days to review the figures and respond. Defendants forwarded to the City

---

1. Comprehensive Employment and Training Act, 29 U.S.C. § 801 *et seq.*

certain "unrefined" data to assist the City's review. The City objected and requested further explanatory documentation. This administrative challenge to both the pretest figures and the 1975 estimate was rejected, and the estimate forwarded to the Revenue Sharing Director was made final.

In March 1977, the City's attorney submitted a letter request to the defendant Bureau pursuant to the Freedom of Information Act [hereafter "FOIA"], seeking information regarding the conduct of the pretest census. The majority of the specific requests were denied, based on the sections of the Census Act mandating confidentiality for certain categories of census data. *See* 13 U.S.C. §§ 8, 9. However, defendants granted the request for some of the information requested.[2]

The instant action followed. The individual plaintiffs assert that the denial of access to census documents deprived them of an opportunity to present comment, to which they were entitled by defendant Bureau's "Local Review" procedure for the pretest census. They challenge this as violative of substantive and procedural due process within the fifth amendment. (Count II). All plaintiffs claim that both the pretest census and the population estimates based thereon, particularly the 1975 estimate, represent arbitrary and capricious agency action within § 10 of the Administrative Procedures Act [hereafter "APA"], 5 U.S.C. § 706(2)(A). (Counts III and IV). Finally, plaintiffs assert that defendants' undercounting of minority groups is in violation of the 1968 Civil Rights Act, 42 U.S.C. § 3601 *et seq.*, entitled "Fair Housing." Plaintiffs claim that § 3608(c) of that subchapter places an affirmative duty on defendant to rectify the undercounting of minorities in order to promote nondiscriminatory housing. (Count VI).[3]

Defendants' motion to dismiss attacks the individual plaintiffs' standing to challenge the census figures on either the constitutional grounds or under the APA. Defendants also assert that the census determinations are not judicially reviewable under the APA, as agency action committed to agency discretion by law, within 5 U.S.C. § 701(a)(2). Finally, defendants argue that the 1968 Civil Rights Act provides no private right of action, and consequently plaintiffs have failed to state a claim upon which relief can be granted.

## I. *Standing of Individual Plaintiffs*

■ The APA, 5 U.S.C. § 702, authorizes judicial review of agency action by "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute."

In *Association of Data Processing Service Organizations v. Camp*, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970), the United States Supreme Court formulated a two-step test for standing under § 702. First, a plaintiff must satisfy the "case or controversy" requirement of Article III by alleging an "injury in fact, economic or otherwise." *Id.* at 152, 90 S.Ct. at 829. Second, plaintiffs must assert an interest to be protected which is "arguably within the zone of interests to be protected or regulated by the statute . . . in question." *Id.* at 153, 90 S.Ct. at 830. *See, e. g., Concerned Residents of Buck Hill Falls v. Grant*, 537 F.2d 29 (3rd Cir. 1976); *Davis v. Romney*, 490 F.2d 1360 (3rd Cir. 1974).

### (a) *Injury in Fact*

Plaintiffs allege that Camden will lose federal and state funding generally, and

2. Documents for which FOIA requests were granted include: pretest instructions, analyses of results, names of field staff ("enumerators"), a description of staff selection process, a demographic profile of enumerators, and a tract breakdown of pretest population figures by race. Plaintiff City appealed the denial of the other portions of its FOIA request; the denial

was upheld by defendant Director by letter in May 1977.

3. Count I seeks a declaratory judgment that the pretest census figures are not binding on Camden and asks the court to enjoin their use. This count is not the subject of the instant motion to dismiss. Count V has been voluntarily dismissed by plaintiffs.

specifically that the City will lose its "prime sponsor" status with regard to the CETA program due to defendants' undercounting in the pretest census and the annual estimate. (Amended Complaint ¶¶ 27, 28). The individual plaintiffs, Diaz and Broome, who are presently employed in CETA-funded jobs, allege that they are threatened with loss of those jobs if funds are cut based on the pretest and estimate census figures erroneously indicating a decline in Camden's population below the 100,000 figure needed for "prime sponsor" status under the CETA program. *See* 29 U.S.C. § 812(a)(2). Plaintiff Langford who has been certified eligible for CETA but who is not employed because of inadequate funds alleges that her injury stems from the erroneous undercounting of Camden's population.[4]

As a preliminary matter, we note that this is a motion to dismiss at which stage we must accept as true all material factual allegations of the complaint and construe it in the light most favorable to plaintiffs. *Warth v. Seldin,* 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). Accordingly, we assume that the population of Camden was undercounted in the 1970 census, that the pretest census figures underestimate Camden's population, and that the annual population estimate was derived from the erroneous pretest results and therefore also undercounts Camden's true population. Further, we assume that the undercounted population figures have been or will be forwarded to federal officials who allocate funds to localities on the basis of population figures, particularly the Secretary of Labor for the CETA program. Finally, we assume that the Secretary has underallocated CETA funds to Camden because of the census pretest undercount.

The individual plaintiffs allege an indirect injury. That is, due to the undercount, they are deprived of CETA-funded jobs which they otherwise would have had because defendants' undercounting caused another agency to shortchange Camden in its federal funding. In support of their claim to standing, plaintiffs rely principally on *United States v. SCRAP,* 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973).[5] In that case, the Supreme Court upheld the standing of a student environmental group to challenge an ICC order which allowed an increase in freight rates. The *SCRAP* plaintiffs alleged that this would discourage use of recyclable materials and would cause greater exploitation of natural resources. They further claimed that this would injure them in their enjoyment of those natural resources and would force them to pay higher prices for finished goods. While the Court conceded that the allegations involved an "attenuated line of causation to the eventual injury," *id.* at 688, 93 S.Ct. at 2416, it upheld the plaintiffs' standing when challenged in a motion to dismiss.

The *SCRAP* Court emphasized the assumption of truth which must be accorded to a plaintiff's allegations on a motion to dismiss. All that is necessary, according to the *SCRAP* Court, is that plaintiffs have alleged "a specific and perceptible harm that distinguished them from other citizens who had not used the natural resources that were claimed to be affected." *Id.* at 689, 93 S.Ct. at 2416. If defendants wish to contest the truth of the allegations of injury and the causal connection between the injury and the wrong alleged, they must do so with supporting affidavits and other evi-

4. Plaintiffs allege that the pretest and estimate figures have been forwarded to the various federal offices which allocate federal program funds for which Camden would be eligible. (Amended Complaint ¶¶ 19, 20). The Census Act, 13 U.S.C. § 183, authorizes transmittal, via the President, of interim population figures for the use of such federal agencies.

5. Plaintiffs' reliance on *Planned Parenthood of Missouri v. Danforth,* 428 U.S. 52, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976) is misplaced be-

cause that case involved allegations of direct injury. There, plaintiff physicians were held to have standing to challenge a statute regulating abortions. They were not required to show any loss of specific employment, patient, or medical opportunity. Injury to their medical practice generally, which they alleged, resulted directly from the challenged statute. *Id.* at 62, 96 S.Ct. 2831. This direct causal connection between the challenged statute and the injury is absent in this case.

dence pursuant to a motion for summary judgment.

■ In the instant case, we must assume that the undercounting in the census figures will cause Camden to lose federal funds to which it would otherwise be entitled under the CETA program. Defendants argue that there is "no certitude" that an undercount would affect CETA grants since population is only one element considered in making funding allocations. (Supp. Brief, pages 4 to 5). This is the sort of factual issue which requires testing by affidavit or testimony, and is not an appropriate basis on which to deny standing in a motion to dismiss.

However, even assuming that Camden would have more CETA funding available were its population properly counted, the standing of these individuals would not necessarily be established. *SCRAP's* liberal attitude regarding standing must be considered in conjunction with subsequent Supreme Court holdings denying standing in indirect causation cases. In *Warth v. Seldin, supra,* the Supreme Court, affirming the dismissal of a complaint, held that individuals challenging allegedly exclusionary zoning practices of a township as class representatives lacked standing. The plaintiffs were not residents of the township and did not point to any particular housing project in which they could live but for the challenged zoning practices. The Court stated that indirectness of injury does not preclude standing, but "may make it substantially more difficult to meet the minimum requirement of Art. III." *Id.* 422 U.S. at 505, 95 S.Ct. at 2208.

■ *Warth* held that individual plaintiffs alleging injury on behalf of a class must themselves be injured or be threatened with injury so that any relief afforded would benefit them personally:

"Petitioners must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent. Unless these petitioners can thus demonstrate the requisite case or controversy between themselves personally and respondents, 'none may seek relief on behalf of himself or any other member of the class.' [citations omitted]."
*Id.* at 503, 95 S.Ct. at 2207.

In the instant case, plaintiffs' allegation that Camden will lose its "prime sponsor" status with regard to the CETA program is sufficient to establish injury-in-fact to the individual plaintiffs. Were Camden to fall outside of this category because the pretest census and 1975 population estimate sets its population at less than the 100,000 required for "prime sponsors," Camden as a single entity would no longer receive any funds under the CETA program. Plaintiffs Diaz and Broome would, along with all other Camden residents currently employed in CETA jobs, lose those positions. While it may be true that Camden could join with other governmental units and receive CETA funds on a consolidated basis, there is no evidence whatsoever on the record concerning the details of CETA fund allocations. This sort of detailed factual inquiry is more appropriate to a motion for summary judgment. On the record now before the court, the threat to these named plaintiffs, Broome and Diaz, is sufficiently demonstrated to withstand a motion to dismiss.

We reach a similar conclusion with respect to plaintiff Langford who is currently eligible for the CETA program but is unemployed because there are insufficient funds to accommodate her. We assume the truth of plaintiffs' allegations that if Camden's population were properly counted, its CETA funding would be increased. In order to find that this plaintiff would herself be among those to obtain a job were CETA funds increased, we must further assume that all those eligible for the program would receive jobs were Camden's funds properly appropriated. While this is not specifically alleged, we will so find by construing the complaint in the manner most favorable to the plaintiffs, as we are bound to do for purposes of a motion to dismiss. Alternatively, we find that this is the sort of factual dispute as to standing which de-

fendant must challenge on a motion for summary judgment with supporting evidence, as the Supreme Court noted in *SCRAP, supra.*

While these plaintiffs are personally injured, as required by *Warth,* this does not end our inquiry. In that case the Supreme Court emphasized that a plaintiff's allegations must show a "substantial probability" that if a court affords the relief requested, the injury will be redressed. *Id.* at 504, 95 S.Ct. 2197. That is, the injury alleged must not be so remote from the defendant's challenged actions that a court is forced to speculate on the actions of third parties not before the court to assess the likelihood of relief. In *Simon v. Eastern Kentucky Welfare Rights Org.,* 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976), the Supreme Court, as in *Warth,* held that a motion to dismiss should have been granted for lack of standing. The *Simon* plaintiffs claimed that an allegedly unauthorized amendment of the federal tax regulations by the Secretary of the Treasury and the Commissioner of Internal Revenue encouraged private hospitals to deny indigent individuals free medical care. Each plaintiff alleged that he had personally experienced such a denial. Nevertheless, the Court ruled that they lacked standing, because the injury was too remote from the allegedly wrongful administrative action.

> "It is purely speculative whether the denials of service specified in the complaint fairly can be traced to petitioners' 'encouragement' or instead result from decisions made by the hospitals without regard to the tax implications. It is equally speculative whether the desired exercise of the court's remedial powers in this suit would result in the availability to respondents of such services."

*Id.* at 42–43, 96 S.Ct. at 1926.

The Court was concerned that the allegations in the complaint offered no guidance in determining the hospitals' motives, whether they were tax-related or not, in refusing to afford plaintiffs free medical care. Consequently, the Court had no basis for assessing what the hospitals would do

were a court to force defendants to change the tax regulations. Similarly, in *Warth,* plaintiffs would not be able to live in the township whose zoning practices they attacked, even were a court to rule them illegal, unless a builder actually constructed housing there suitable for those plaintiffs. The Court ruled that too much judicial guesswork was required to determine the probable actions of such third parties.

The allegations in the instant complaint do not require this degree of judicial speculation. It is true that the availability of CETA jobs to the named plaintiffs depends on the allocation decision made by the Secretary of Labor, and not directly by the defendants. However, the Secretary is governed by specific statutory provisions which mandate that he consider certain criteria in awarding CETA funds. *See* 42 U.S.C. § 801 *et seq.*

We know that census figures are certified by defendants to the Secretary and do play a role in CETA fund allocation, as defendants concede at page 4 of their Supplemental Brief in support of this motion. *See* 29 U.S.C. § 813. The unfounded speculation as to causation which proved fatal to standing in *Warth* and *Simon, supra,* is not present here. Accordingly, we find that plaintiffs' injury "fairly can be traced" to defendants' undercounting of Camden's population. We hold that the individual plaintiffs have presented enough evidence regarding their standing to withstand a motion to dismiss.

**(b)** *Zone of Interest*

■ The second prong of the *Data Processing* test for standing to challenge administrative action requires a finding that the interest sought to be protected is "arguably within the zone of interests to be protected or regulated by the statute . . . in question."

The Third Circuit has held that in making the zone of interest inquiry, a court must look to the whole statute in question and give effect to its overall purposes. *Concerned Residents of Buck Hill Falls v. Grant, supra; Davis v. Romney, supra.* In these cases as well as in *Data Processing,*

*supra,* the courts looked to the statute itself and its legislative history to determine what interests Congress meant to protect by a particular enactment. *See also Barlow v. Collins,* 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970).

In the instant case, the "relevant statute" within the meaning of the APA, 5 U.S.C. § 702, is the Census Act, 13 U.S.C. § 1 *et seq.* In 1976, Congress amended the statute, which now provides for interim census counts between each decennial census. Of particular relevance here, 13 U.S.C. § 181 requires the Bureau of the Census annually to produce population figures for municipalities like Camden. *See also* 13 U.S.C. § 184. The Bureau is authorized to make surveys necessary to furnish this annual data, 13 U.S.C. § 182, and such interim data is transmitted to the President for use "by the appropriate departments and agencies of the executive branch." 13 U.S.C. § 183.

The legislative history of the 1976 amendments indicates that one of the concerns of Congress was to ensure more equitable distribution of federal funds by the use of current population data. One of the bill's Senate sponsors commented in regard to the mid-decade census, also the subject of the legislation:

"When we enact Federal programs that deliver essential services to our citizens— needed services in education, health, environmental protection, law enforcement, and other areas—formulas are developed by which the Federal money will be channeled to the areas that are most deserving of aid.

"These formulas have one primary goal: Equity. That means putting the money where the people to be served actually are."

122 Cong.Rec. 16557 (Statement by Sen. Stone).

In regard to the use of the annual updated figures for funding allocations, the Senate sponsor commented:

"Then, perhaps, we can truly say that to the fullest extent possible, the Congress has insured that we 'put the money where the people are now'—not where they were 10 or even 5 years ago."

122 Cong.Rec. 16558 (Statement by Sen. Stone).

It is clear, then, that the plaintiffs' interest in a federally-funded jobs program is within the "zone of interest" contemplated by Congress when it mandated census counts between each decennial census. The population estimate at issue here was formulated by defendants pursuant to 13 U.S.C. § 181. The pretest census was undertaken under the authority of 13 U.S.C. § 193, which provides:

§ 193. Preliminary and supplemental statistics

In advance of, in conjunction with, or after the taking of each census provided for by this chapter, the Secretary may make surveys and collect such preliminary and supplementary statistics related to the main topic of the census as are necessary to the initiation, taking, or completion thereof.

This provision by its terms is meant to aid the preparation of other census counts. Therefore, the considerations of equitable distribution of federal funds expressed in the legislative history cited above encompass the pretest census as well as the population estimate.

It is not a legitimate objection under the "zone of interest" test to argue, as do defendants, that there is no "right to be counted" or no right to a government job in advance of appointment. This confuses the merits of the controversy with the issue of standing. *See Assn. of Data Processing Service Org. v. Camp, supra; Barlow v. Collins, supra.* Consequently, we conclude that plaintiffs have standing under the APA to challenge the pretest census and the population estimate.

## II. *Reviewability Under the APA*

Defendants argue that the conduct of the pretest census here challenged is not reviewable agency action within the APA, 5 U.S.C. § 702. Section 701(a)(2) of that Act excepts from judicial review agency action which "is committed to agency discretion by

law." In apparent contradiction, § 706(2)(A) of the APA empowers a reviewing court to set aside agency action found to be, *inter alia*, "an abuse of discretion."

■ The United States Supreme Court has held that the exception to judicial review in § 701(a)(2) is a very narrow one. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). A federal agency seeking to preclude judicial review "bears the heavy burden of overcoming the strong presumption that Congress did not mean to prohibit all judicial review" of its decisions. *Dunlop v. Bachowski*, 421 U.S. 560, 567, 95 S.Ct. 1851, 1857, 44 L.Ed.2d 377 (1975). The defendant must show by "clear and convincing evidence" that Congress intended to restrict judicial review of administrative action. *Abbott Laboratories v. Gardner*, 387 U.S. 136, 140, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967); *Dunlop v. Bachowski, supra*, 421 U.S. at 567, 95 S.Ct. 1851; *Concerned Residents of Buck Hill Falls v. Grant, supra* at 34. In short, nonreviewability is the exception and not the rule. *Barlow v. Collins, supra.*

In the absence of an explicit statutory prohibition on judicial review, agency action is committed to agency discretion and thus nonreviewable only "in those rare instances where 'statutes are drawn in such broad terms that . . . there is no law to apply.'" *Citizens to Preserve Overton Park, Inc. v. Volpe, supra*, 401 U.S. at 411, 91 S.Ct. at 821. In that case, the Supreme Court held reviewable an administrative decision to allow construction of a road through a park. The Court found that statutory language calling for construction where no "feasible and prudent alternative" existed provided a sufficient legal standard to permit judicial review. There was no further definition of those statutory terms. Similarly, in *Concerned Residents of Buck Hill Falls v. Grant, supra*, the Third Circuit found an administrative decision to be reviewable within the APA based on the statutory language "satisfactory assurances." The Court of Appeals noted:

"The statute indisputably vests a broad discretion in the Secretary. But that discretion is not wholly without judicially discernible limits. Although the administrative and legislative history of the Act does not define the phrase 'satisfactory assurances,' it does furnish at least some 'law' [citing *Overton Park, supra* ] against which a court can measure the Secretary's determination."
*Id.* at 35–36.

In the instant case, the Census Act, 13 U.S.C. § 181, provides that the defendants annually produce current population data for cities like Camden. As discussed above, the Bureau of the Census formulates the annual population estimates pursuant to this statutory mandate. The 1975 estimate and the pretest census, which plaintiffs allege were used in deriving that estimate, are the subjects of this suit. Therefore, it is determinative that § 181 explicitly states:

"Such data may be produced by means of sampling of other methods, which the Secretary determines will produce *current, comprehensive, and reliable data.*" [emphasis supplied].

This statutory standard by which to judge defendants' actions is at least as explicit as that deemed sufficient for review in *Overton Park* or in *Grant, supra*.

■ While this provision and other provisions of the statute direct that the Secretary have discretion to choose the actual methods to be utilized in conducting a census, *see* 13 U.S.C. §§ 5, 182, 193, 195, this does not preclude judicial review. Instead, this administrative discretion serves to circumscribe the scope of judicial review within § 706 of the APA, which allows a reviewing court to overturn an administrative decision which is "arbitrary, capricious, [or] an abuse of discretion." *See Dunlop v. Bachowski, supra; Overton Park, supra*. This court's review will be limited to an examination of the reasonableness of or rational basis for the methods used by defendants in conducting the pretest census and in formulating the annual population estimate. Indeed, in cases challenging the conduct of the 1970 decennial census, courts have undertaken such a review. They did so in the face of explicit recognition of the broad

discretion accorded the Director of the Bureau of the Census in determining the methods of enumeration under the census. *See Borough of Bethel Park v. Stans*, 319 F.Supp. 971 (W.D.Pa.1970), *aff'd*, 449 F.2d 575 (3rd Cir. 1971); *Quon v. Stans*, 309 F.Supp. 604 (N.D.Cal.1970). *See also Confederacion de la Raza Unida v. Brown*, 345 F.Supp. 909 (N.D.Cal.1972) (challenging alleged undercounting of Hispanic population).

The limited scope of judicial review of the Census Bureau's methods answers defendants' arguments concerning the expertise required to evaluate technical statistical questions. Defendants argue that this precludes judicial review, a proposition rejected in *Overton Park, supra*. The Supreme Court there held that limited judicial review was permissible, although the administrative decision at issue involved a judgment based on "sound engineering." *Id.*, 401 U.S. at 411, 91 S.Ct. 814.

The scope of this court's review under § 706 of the APA will be dictated by *Overton Park, supra*. While the reviewing court is to engage in a "substantial inquiry," the administrative decision enjoys a presumption of regularity. *Id.* at 415, 91 S.Ct. 814. First, the court must determine whether the defendants acted within the scope of their authority under the Census Act. Second, in determining whether the conduct of the census was arbitrary and capricious or an abuse of discretion, the court considers "whether the decision was based on a consideration of relevant factors and whether there has been a clear error of judgment." *Id.* at 416, 91 S.Ct. at 824. In short, our review will recognize the broad discretion accorded to defendants:

"Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency."[6]
*Id.*

### III. Cause of Action Under 42 U.S.C. § 3608(c)

Finally, we address plaintiffs' argument based on 42 U.S.C. § 3608(c), part of Title VIII of the Fair Housing Act, which provides:

All executive departments and agencies shall administer their programs and activities relating to housing and urban development in a manner affirmatively to further the purposes of this subchapter and shall cooperate with the Secretary [of the Department of Housing and Urban Development, "HUD"] to further such purposes.

Plaintiffs contend that this directive to agencies to provide for fair housing, *see* 42 U.S.C. § 3601, places an affirmative duty on defendants to correct undercounting of minority groups. They point to *Shannon v. HUD*, 436 F.2d 809 (3rd Cir. 1970), where private residents, businessmen and civic organizations connected with an urban renewal area were allowed to challenge HUD action with regard to certain housing developments. The *Shannon* plaintiffs relied on, *inter alia*, 42 U.S.C. § 3608(d)(5) as the basis of their argument that HUD had breached its legal duty.

First, we have grave doubts about the standing of all the plaintiffs in the instant case to press this action on this theory. *See Acevedo v. Nassau Co.*, 500 F.2d 1078, 1082 (2nd Cir. 1974). Second, plaintiffs have not made a strong enough showing that 42 U.S.C. § 3608(c) in fact places an affirmative duty upon these defendants to do anything at all. By its terms, the provision is directed at agencies which administer "programs and activities relating to housing and urban development." Plaintiffs allege, albeit obliquely, that the undercounted census figures will adversely affect Camden's eligibility for

---

**6.** Our conclusion is not undermined by *City of Newark v. Blumenthal*, 457 F.Supp. 30 (D.D.C. 1978) which was cited by both parties. In that case, the court held nonreviewable the Secretary of the Treasury's determination to use certain census data in computing local allocations under the Revenue Sharing Act. The result there turned, properly, on the particular language of that legislation which the court found provided no standard for judicial review. Since we deal with a wholly different statute, the Census Act, our analysis is necessarily different.

**54**

federal housing assistance and the city's urban redevelopment efforts. (Amended Complaint ¶¶ 27, 29). However, there is no allegation that defendants are directly concerned with any housing or redevelopment programs.

By contrast, in *Shannon* the plaintiffs attacked HUD. That agency was not only directly responsible for the housing projects there at issue, but is the agency to which 42 U.S.C. § 3608 is directed. Section 3608(a) places the responsibility for administering the entire Act on HUD. Section 3608(c) mandates that all other executive departments and agencies cooperate with HUD, and the affirmative duties set out in § 3608(d) are charged to HUD. The Congressional intent to impose affirmative duties on the defendant in *Shannon* was thus clear from the language of the statute itself. Plaintiffs in the case at bar have pointed the court to no legislative history or other indication of a Congressional intent to impose such affirmative duties on defendants. In *Acevedo v. Nassau Co., supra*, the Second Circuit declined to find a private right of action to enforce the Fair Housing Act against the General Services Administration. There, the agency had been intimately involved with HUD in developing low-income housing.

Here there is no allegation of direct involvement by a defendant agency in a housing project; the court cannot infer a Congressional intent to impose an affirmative duty enforceable by private plaintiffs. Because of the court's disposition of the standing and reviewability issues under the APA, plaintiffs will be able to press their claims against defendants. There is, therefore, no need in this case to reach far afield and imply a novel cause of action from non-specific statutory language.

IV. *Conclusions*

Based on the foregoing, the motion to dismiss Counts II, III, and IV of the Amended Complaint for lack of subject matter jurisdiction, Fed.R.Civ.P. 12(b)(1), is denied. The motion to dismiss Count VI of the Amended Complaint for failure to state a claim upon which relief can be granted, Fed.R.Civ.P. 12(b)(6), is granted.